COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-239-CV

 

 

IN THE INTEREST OF C.H.

AND M.H., THE CHILDREN 

AND IN THE INTEREST OF

E.M.B., R.H.D.G., AND
J.G.G., 

MINOR CHILDREN

 

                                              ------------

 

            FROM THE 362ND
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








After a
trial, a jury found by clear and convincing evidence that Appellant A.G.
(Mother) knowingly placed or knowingly allowed her five children, E.M.B.,
R.H.D.G., J.G.G., C.H., and M.H., to remain in conditions or surroundings which
endangered their physical or emotional well-being; engaged in conduct or
knowingly placed her children with persons who engaged in conduct which
endangered the children=s physical or emotional
well-being; and failed to comply with the provisions of a court order that
specifically established the actions necessary for the return of the children,
who had been in the permanent or temporary managing conservatorship of the Texas
Department of Family and Protective Services for not less than nine months as a
result of the children=s removal from Mother under
chapter 262 for the abuse or neglect of the children.[2]  The jury also found by clear and convincing
evidence that termination of the parent-child relationship between Mother and
the children was in the children=s best
interest.[3]  The trial court made the same findings and
terminated Mother=s rights to the children.








The State contends that we should dismiss Mother=s appeal
as to the termination of her rights to the three older children, E.M.B.,
R.H.D.G., and J.G.G.  Trial Court Cause
Number 2006-40924-362, regarding E.M.B., R.H.D.G., and J.G.G., and Trial Court
Cause Number 2007-40820-362, regarding C.H. and M.H., were consolidated for
trial.  We decline the State=s
invitation to revisit our acceptance of Mother=s
amended notice of appeal, our grant of the State=s motion
that the appellate record be supplemented, and our implicit denial of the State=s
alternate motion to dismiss Mother=s appeal
of the termination of her parental rights to E.M.B., R.H.D.G., and J.G.G.
because these cases were consolidated for trial, the jury delivered one
verdict, and the trial court told Appellant in open court after the verdict was
announced that she had Athe right to appeal this case.@  [Emphasis added.]

In eight points, Mother contends that the
evidence is legally and factually insufficient to support each finding.  Because we hold that the evidence is legally
and factually sufficient to support the endangerment findings[4]
and the best interest finding,[5]
we affirm the trial court=s judgments.

The jury heard the following evidence in these
cases, cases where termination was sought after reunification failed.  The State=s first
witness was Mother.  Mother testified
that CPS contacted her in August 2006 because someone had reported that she was
using methamphetamine.  At the time,
Mother and her three children, E.M.B., R.H.D.G., and J.G.G., were living with
Mother=s
boyfriend, C.S.H.  After CPS initially
contacted her in August 2006, Mother withdrew E.M.B. from school to prevent CPS
from taking her without Mother=s
knowledge, left C.S.H.=s apartment, and moved into her
grandmother=s home.








Mother admitted at trial that she had in fact
been smoking methamphetamine every other day or every day in August 2006.  She at first refused to take a drug test
because she knew it would be dirty. 
Mother and the three children all tested positive for
methamphetamine.  CPS removed the
children on August 30, 2006.

Mother admitted at trial that she, C.S.H., and
her brother had smoked methamphetamine in the home with the three children
before the removal, that her mother and grandmother both knew she used, and
that they both knew she used when the children were with her.  She admitted that the children had seen her
under the influence of methamphetamine. 
She said that they did not see her using but that they were in the home
under her care when she was using. 
Mother testified that methamphetamine makes you stay up for days, that
she did not think that she was a good mother when she was using
methamphetamine, and that she was not able to meet her children=s
emotional or physical needs when she was using methamphetamine.








Mother admitted that the drugs in the children=s
systems put them in danger, that her home life in August 2006 was not good for
them, and that she placed them in danger. 
She admitted that her drug use when her children were with her in the
home endangered their physical or emotional well-being and that her children
did not deserve to be in that environment. 
She admitted telling CASA advocate Carolyn Kirk that A[t]he
kids ha[d] seen things and been around things they shouldn=t have,
and [that she] hope[d] it wo[uld]n=t affect
them later in life.@

At the time of the August 2006 removal, Mother=s
children knew that C.S.H. smoked marijuana; she was aware that he openly rolled
cigarettes in their presence.  She
testified at trial that she did not think that was a good environment for them
but that she allowed it to go on because she was not Aclearheaded
at the time.@ 
After she admitted to CPS that C.S.H. used marijuana, she denied to CPS
that he was her boyfriend because the CPS worker told her that she could not be
with him based on his drug use.  She
testified that she stayed with him against CPS=s advice
because she cared for him and loved him.

Mother also testified that C.S.H. sold marijuana
and that after the removal, she turned a blind eye to whether he was still
dealing because she was clean and had nowhere else to go.  Yet she admitted that she actually had
received assisted housing in Gainesville for herself and her children (should
they be returned to her) but had lost it because C.S.H. lived with her in
violation of the housing agreement.  In
October 2006, he went to jail, and Mother and D.G., R.H.D.G.=s
father, began seeing each other again. 
Mother did not recall if she spent a weekend with D.G. in October 2006.








Mother admitted that after the removal of her
three children, she overdosed on a mixture of alcohol and Aquad
bars@ (xanax)
that she had obtained from C.S.H. and that her friends and family were
concerned that she had tried to kill herself. 
She told psychologist Nichelle Wiggins that she had not tried to kill
herself but had cut herself with a knife. 
After her overdose, she started services with MHMR, but she admitted
that she missed several appointments and in fact had not been for a couple of
months before trial, even though she claimed that treatment was important to
her and that her family was supportive.

Mother=s
testimony was unclear regarding when she started using methamphetamine. At one
point, she stated that she began using methamphetamine before her oldest child,
E.M.B., was born.  Later, she indicated
that it might have been after E.M.B.=s birth;
finally, she testified that it was after the birth of her second child,
R.H.D.G., which would indicate at least more than three years= use
before the August 2006 investigation and removal.

Mother also testified that she started using
methamphetamine with D.G.  They married
in 1999 when she was seventeen years old, a few days before he went to prison
after being convicted of aggravated assault with a deadly weapon.








In 2000, she became pregnant with E.M.B., whose
father was M.B.  Mother, M.B., and E.M.B.
lived with Mother=s grandparents.  Mother=s niece
testified that Mother used methamphetamine while she was pregnant with E.M.B.
and after E.M.B. was born.

By the time D.G. was released from prison in
2002, Mother testified, she and M.B. had broken up due to his alcoholism, but
Mother would visit him Aevery once in a while.@  Mother did not tell Wiggins that M.B. was an
alcoholic; rather, Mother told her that he was a good father and involved in
their daughter=s life.








After D.G. was released from prison, Mother and
D.G. lived together at his parents= house,
along with E.M.B.  Mother then got
pregnant with R.H.D.G.  D.G. was present
for R.H.D.G.=s birth in 2003, but D.G. was
not involved with their son afterward for about a year, and Mother and her
children lived with her grandmother. 
When R.H.D.G. was about a year old, Mother allowed D.G. to take their
son for short periods of possession.  She
testified that she found out that D.G. was using and dealing drugs in
2005.  Mother used methamphetamine with
him, and she admitted at trial that she used drugs at the beginning of her
pregnancy with J.G.G.  But she stated
that she did not discover that she was pregnant until she was five months
along; J.G.G. was born in January 2006. 
According to Mother, D.G. had forced her to sleep with another drug
dealer to whom D.G. owed money; that man was J.G.G.=s
biological father.

Mother admitted that she had allowed D.G. to take
R.H.D.G. for a visit on one occasion in the spring of 2006 even though she had
had concerns because of D.G.=s drug
dealing and drug use.  She also admitted
that letting him take R.H.D.G. was not a good idea and that D.G. brought
R.H.D.G. home at 5:00 a.m. once or twice. 
Mother also testified that she may have told Wiggins that she Anever
denied [D.G.] any access to [R.H.D.G.] because, after all, [D.G.] was [R.H.D.G.=s]
father.@  Michele Greer, Mother=s
therapist for almost a year during the case, testified that Mother had reported
that D.G. had kept R.H.D.G. from Mother for several weeks at one point.








Initially, Mother admitted that she used
methamphetamine until August 2007, a year after her older three children were
removed, but she stated that she was only using maybe twice a month at that
point and was not using with C.S.H. or her family members.  Later she testified that she last smoked
methamphetamine in February 2007 and that she did so with C.S.H.  She also testified that she last used drugs
at the end of January or beginning of February 2007.  She conceded that she was using while she was
in drug treatment during the first six months after the removal.  Her last positive drug test occurred in March
2007.  Mother=s niece,
who testified that she had last used methamphetamine with Mother five or six
years before trial and had not used drugs for five or six years, testified that
she did not know whether Mother still used drugs but that she did know that
Mother still hung out with the same people with whom she had used drugs in the
past.

Mother could not remember when she told the CPS
worker that she was pregnant with twins, fathered by C.S.H., but she delivered
the twins early in June 2007, while she still lived in the Gainesville
home.  Mother lied to the hospital about
the location of her older three children, stating that they were staying with
her grandmother.  Mother admitted at
trial that the hospital expressed concerns about C.S.H. and her attentiveness
to the twins.  Although Mother admitted
drug use during the pregnancy with the twins and that the drug use put them in
danger, she testified that she did not believe that her drug use during the
pregnancy endangered their health.  The
twins were not tested for the presence of drugs at their birth.  After CPS found out that the twins had been
born, CPS removed the twins and placed them with their paternal grandfather and
his wife.








After admitting that she had used methamphetamine
during her first stint of outpatient drug treatment, Mother attended outpatient
drug treatment again beginning in September 2007, after the twins=
birth.  The plan was for her to attend
individual counseling sessions once a month and outpatient treatment twice a
week for ninety days.  She testified that
she got a certificate for completion but did not know if she had completed the
required number of sessions.  The
progress notes in State=s Exhibit 9 indicate that she Awas seen
regularly for individual counseling and attended group@
counseling [twice a] week, Asuccessfully
completed the outpatient treatment program,@ Amet
[the] goals and objectives on her treatment plan,@ and
received a certificate for successfully completing the program.

Mother also testified that she went to NA and AA
at first but eventually quit because she did not find it helpful.  She was not attending at the time of trial,
and it had Abeen a while@ since
she had last attended; she had Abeen to
a few here and there@ despite the trial court=s order
that she attend weekly.  She admitted
that despite her testimony at a prior hearing that she was working the steps of
AA, she might not have been in fact working the steps.  She could not explain step one, three, or
four at trial.  She testified at trial
that she was not an alcoholic, that she was a recovering addict, and that she
did not have a current drug problem.








Although Mother testified that her family members
did not give her drugs when she initially began using, she admitted that they
did provide her with drugs later.  After
a family group conference in December 2006, she told the CPS caseworker that
her mother Ause[d] all her money up at the
beginning of the month on drugs and then [had] to rely on [her own mother, the
children=s
great-grandmother] for care,@ that
her mother and stepfather used on a regular basis, and that they were Askitzing
on drugs@ during
the family group conference.

In October 2006, Mother began seeing Greer.  Mother attended all the October and November
sessions, missed one in December and one in January, attended only one in
February, and attended three in March 2007 before Greer stopped the services
because Mother=s obstetrician had ordered her
to be on bed rest.  According to Greer,
she saw Mother again for one visit in July 2007 and last saw Mother in August
2007, when she terminated the sessions because of the missed appointments and
lack of progress.








Greer testified that Mother saw CPS as being
unfair and did not feel responsible for the initial removal.  Even though Mother would sometimes admit that
her drug use caused the removal, she did not seem to understand the effect her
drug use had on the children or accept her role in the removal.  Greer testified that such acceptance would
indicate that a person could make changes to avoid repeating the same mistakes
in the future.  Greer also testified that
Mother=s story
about her substance abuse changed over the period of counseling.  Greer opined that in addition to her drug
use, Mother had other issues, including bipolar disorder, for which Greer
believed Mother did not seek appropriate treatment; long-standing maladaptive
personality traits, like dependency; and some impulsivity.

Greer also testified that Mother, whose IQ was 76
(in the borderline rangeCbelow 70 indicates mild mental
retardation), made only minimal progress toward the therapeutic goals of
increasing her adaptive coping skills, becoming self-motivated, and decreasing
her dependency on others.  As evidence of
her conclusion, Greer pointed to Mother=s choice
to spend four days with D.G. and do drugs with him in October 2006, her choice
to visit the children the next day after she used drugs, and her choice not to
follow the doctor=s instructions regarding bed
rest when she was pregnant with the twins, wanting to please others instead of
putting the twins= needs first.  Greer also testified that Mother had
difficulty setting boundaries in her relationships, pointing to her
relationships with the children=s
fathers.  Greer concluded that Mother
never showed an ability to distance herself from negative influences and people
but seemed to gravitate toward them. 
Greer testified that when she terminated counseling in August 2007,
Mother was not able to function independently, was not taking responsibility
for her actions, and was not making good choices in relationships.  But Greer also testified that Mother is a
very caring person, that it was clear that Mother loved her children, and that
she cared about other people, just too much.








About three months after the twins= birth,
on September 14, 2007, Mother began seeing Jim Chambers for counseling.  At the beginning, she attended weekly.  But she only went twice in November,
cancelling one appointment and Ano-showing@
another, and did not go at all in December. 
Nevertheless, she testified at a hearing in December that she was
attending counseling regularly.  After
the children were returned in December 2007 and January 2008, she attended one
counseling session in January.

Against the wishes of CPS and CASA, the older
three children were returned to the home in a monitored return on December 22,
2007, and the twins were returned to the home in a monitored return on January
10, 2008.  Mother worked nights, so
C.S.H., who had also participated in some services, cared for the children in
her absence.  Mother had testified in
December before the return that if C.S.H. did anything wrong, he would be out
and that she would put her children before him. 
One week after the older children were sent home, he was arrested for
evading arrest.  Mother testified that
she did not ask for details because she was not involved in his actions and did
not care to know.  She admitted at trial
that it would have been a good idea to know what C.S.H. was doing even outside
her presence and that of her children. 
His arrest did not lead Mother to question whether the relationship
should continue.








Mother testified that C.S.H.=s Adrinking
a lot@ after
the children=s return caused her concern but
that she did nothing to stop it; instead she started staying home with
them.  She also admitted that she drank
alcohol despite the warnings about it that she had received in drug treatment.

Mother admitted at the termination trial that she
had lied at a November 2, 2007 hearing scheduled by her attorney to get the
children returned when she testified that she had no knowledge that C.S.H. had
been dealing drugs since they had been together.  She stated that she did not know why she had
lied and admitted that she might have thought she needed to lie to get the
children back in her possession.

K.H., C.S.H.=s
stepmother, testified that she had been concerned about the planned return of
the twins to Mother and C.S.H. because they were not going to the classes they
were supposed to attend and C.S.H. was still doing drugs and drinking
alcohol.  K.H. also testified that after
the twins were born but before their removal, Mother had told her that C.S.H.
was selling drugs.








After the children came home, E.M.B. made an
outcry against C.S.H.  Mother testified
that her mother, who had spent the night on Tuesday, January 29, 2008, told her
two days before the children were again removed on February 1 about the outcry.  Mother also testified that her mother was not
using drugs at that particular time and that she thought that having her around
the children was a good choice because her mother was not using drugs that
day.  Early on Wednesday, January 30,
2008, Mother drove C.S.H. to the jail, where he turned himself in on a
different matter.  After Mother took
E.M.B. to school, the grandmother told her that E.M.B. had reported that C.S.H.
was touching her when Mother was at work. 
Mother testified that she believed her mother.  When Mother talked to E.M.B. about it after
school, Mother testified, E.M.B. denied it. 
On Wednesday night, Mother went to pick C.S.H. up at the jail.  She took the twins and E.M.B.  In the car, Mother asked C.S.H. about the
allegations in front of E.M.B.  Mother
testified that E.M.B. had asked her to talk to C.S.H. about it in front of
E.M.B. because E.M.B. was afraid that she would get in trouble with C.S.H.








On Thursday, January 31, 2008, C.S.H. went to
work, and Mother and all five children stayed at the house.  Mother called K.H. to come over and speak to
E.M.B. that afternoon.  After speaking to
E.M.B., K.H. told Mother that Asomething
had to have happened; [E.M.B.=s] not
lying about it,@ and K.H. made it clear to
Mother that she had to make a decision. 
K.H. testified that she told Mother that she had to either get the
children out of the house or get C.S.H. out of the house.  Mother testified that she had known that she
had to get rid of C.S.H.  She initially
testified that he stayed somewhere else that night, but after being confronted
with her testimony from the February 21, 2008 hearing that he had stayed home
Thursday night, she testified that he had spent Thursday night at home.

On Friday, February 1, 2008, Mother stayed at
home with the children.  That afternoon,
she dropped R.H.D.G. and J.G.G. off at C.S.H.=s place
of employment before taking E.M.B. to karate class.  After class, Mother stopped by her
grandmother=s home but did not tell her
about E.M.B.=s outcry.  Mother admitted that she had known that if
she told her grandmother about E.M.B.=s
outcry, then her grandmother would tell her to end her relationship with
C.S.H.  Mother then picked up C.S.H.,
R.H.D.G., and J.G.G.; E.M.B. was also in the car.  When they got home, the police were waiting.

Mother testified that E.M.B. did not tell her
that C.S.H. was in fact touching her inappropriately until Friday night at the
CPS office, after the children were removed again.  Mother also testified that E.M.B. told her
that she had at first denied the contact because she did not want CPS to take
her away from Mother.  Mother testified
that it would be important to a child who has been molested to know that her
parent would believe her and protect her.








Mother=s niece
testified that Mother told her on Thursday, the day before the second removal,
that E.M.B. had told her on Wednesday that C.S.H. had been touching her while
Mother was at work.  K.H. also testified
that Mother told her on Thursday that she thought that C.S.H. had touched
E.M.B.  Mother's niece testified that
when she asked Mother what she was going to do, Mother said that E.M.B. lied a
lot, that Mother did not know whether E.M.B. was telling the truth, and that Mother
did not think that C.S.H. would do something like that.  A week after the second removal, the niece
testified, Mother and C.S.H. were still together, and Mother told her that she
was going to stay with him because she did not believe that he had molested
E.M.B.

E.M.B.=s
therapist testified that E.M.B. told her that C.S.H. had touched her privates,
that it happened a lot and when Mother was at work, that she had told Mother
about it the first time it happened and had told Mother more than once, that
Mother kept asking her if it really happened, and that E.M.B. believed that
Mother believed C.S.H. instead of her.

On the Monday following the second removal,
Mother called CPS worker Amber O=Guinn to
tell her that she had kicked C.S.H. out of the house.  Mother told Amber that she had not known that
C.S.H. was abusing E.M.B.  At her visit
with the children the day after her telephone call with Amber, despite being
told not to mention or bring up C.S.H., Mother told E.M.B. that she had kicked
C.S.H. out of the house.  Mother
testified that E.M.B. had asked her if she had kicked him out.  The trial court cancelled the visits at that
point, and Mother had no more visits before trial.








After the second removal, Mother called the older
three children=s foster mother Ato check
on them@ and
also told the foster mother that she had not known about the abuse.

At the time of the second removal, Mother asked
that the twins be placed with foster parents instead of C.S.H.=s father
and stepmother, with whom the twins had stayed previously.  CPS believed that one of the grandparents had
forewarned C.S.H. and Mother about the second removal.  The twins were placed with foster parents.

On February 23, 2008, according to Mother, C.S.H.
kicked in the house door, came in, started hitting her, and trashed the
house.  She went to the neighbors and
called 911.  The officer who spoke to
Mother at the scene testified that she told him that C.S.H. had slapped her in
the face, but the officer saw no mark. 
C.S.H. denied the assault, and he told the officer that he still lived
there.  The officer saw men=s
clothes in the dresser.  The police did
not arrest C.S.H.

Mother attended parenting classes.  She completed one set by December 2006.  She completed another set sometime after the
twins were born.  She took only three
weekly classes in the six weeks before trial in May 2008, despite her testimony
in a prior hearing that she was going to begin classes in February 2008.  Her last class was on April 9, 2008.








Mother missed one or two visits with her children
because she forgot to call in or because she overslept; otherwise, she attended
all her scheduled visits unless CPS cancelled them.  She had to leave a visit after she hit
R.H.D.G.; she said they were just playing. 
She denied telling the children on two visits that if they did not put
on their jackets, she would not come back the following week and agreed that
such threats would not be appropriate.

After rescheduling a couple of times, Mother
completed a psychological evaluation with Wiggins in December 2006.  The psychological evaluation showed that she
had a bipolar disorder and limited insight. 
Wiggins testified that the chances of people with limited insight
engaging in maladaptive behavior and making poor decisions are very high.  Wiggins also testified that Mother had
dependency issues and a tendency to rationalize poor decisions and to
externalize, or blame others, for her issues.

After the twins were born, Mother found a job at
Family Dollar.  After about three days,
she was terminated because of a past theft conviction.  Mother soon found a job with Jack-in-the-Box,
which she still had almost nine months later at the time of trial, despite
quitting once and either quitting or getting fired another time.  This was her longest period of employment
ever.








At the time of trial, Mother was living in
Gainesville in the same home she had lived in since at least December
2007.  She testified that it was in the
children=s best
interest to be returned to her because she=s their
mother, she loves them, and she=s Abeen
there@ for
them.

Mother testified that at the time of the first
removal, she had told the CPS worker that it would be better for her children
to be placed in foster care than with a family member because her grandmother,
whom she would have preferred to care for the children, could not take care of
herself and her grandfather was sick. 
One of her aunts already had a CPS history, and the other aunt was not
chosen for a placement.  Mother testified
that her mother and stepfather, who were present at trial, were current users
of methamphetamine.








E.M.B.=s
therapist testified that after the second removal, E.M.B. was terrified of the
dark, had nightmares, and had wet herself. 
The therapist also recommended that weekly therapy continue and
testified that E.M.B. will continue to need to work on and to be able to talk
about the sexual abuse, that she needs a parent who will follow through with
her therapy, that she needs a nurturing and supportive home environment, and
that she needs to be believed about the sexual abuse.  She stated that E.M.B.=s
caregiver will need to be sensitive to her needs as she grows because dealing
with the sexual abuse may be long term. 
The therapist expressed concerns that if E.M.B. were returned to Mother,
Mother would not protect her from sexual abuse or be sensitive to her needs
regarding the sexual abuse.  The
therapist also stated that the more times E.M.B. has to change homes, the
harder that would be, because moving would shake her sense of stability and her
ability to trust.  The therapist
testified that E.M.B.=s anxiety had decreased, that
she was getting more settled with her foster parents, feeling very close to
them and safe with them, and that she trusted her therapist.  The therapist opined that the foster parents= home
was a good environment for E.M.B. and that E.M.B. has bonded with them.  But E.M.B. loves Mother as well and is
conflicted because she wants to be in both places.

The therapist also testified that R.H.D.G. had
started having some issues with acting out sexually.








Stephanie, the foster mother of E.M.B., R.H.D.G.,
and J.G.G., testified that when the children were originally placed in her home
in August 2006, they seemed very unfamiliar with routine and structure.  E.M.B., who was in kindergarten, had not
mastered her colors and did not know her letters or numbers or how to write her
name or even her first initial.  She then
developed self-esteem issues, which led to behavioral problems at school, like
scribbling on another student=s paper,
hitting and pushing on the playground, and having difficulty following
instructions.  The foster parents worked
with her, enrolled her in a social skills class at her school, and took her to
church twice a week to give her more time to be with children her age.

When R.H.D.G. first moved into the foster home,
he had a negative view of police officers and talked about smoking pot, doing
drugs, and drinking beer, both generally and as something he was going to
do.  Stephanie echoed the therapist=s
testimony about R.H.D.G.=s sexual acting out in pre-K.

Stephanie testified that the children=s
behaviors improved over time, that they thrived on routine, that they became
much more secure and confident, and that they went from getting used to
sleeping in their own beds to being able to sleep with the door shut.

When the children were returned to Stephanie
after the second removal, the biggest thing she noticed was fear.  R.H.D.G. was apprehensive about the bedroom
door being shut at night and was defensive and aggressive.  Stephanie testified that it took about two
weeks for him to be Aokay again.@  She also testified, however, that more sexual
acting out occurred after his return. 
E.M.B. had gone from being able to sleep with a dim nightlight to
needing a lamp that illuminated the whole room. 
She also had some daytime urination accidents.








When E.M.B. was returned to Stephanie=s home,
she told her foster mother,  AWe=re here
because of [C.S.H.], but I can=t talk
about it.  My mom and my nana said I can=t talk
about it because it=s all taken care of.@  After her CPS interview, E.M.B. told the
foster parents and R.H.D.G. that A[C.S.H.]
had touched her private parts and that that=s why .
. . she told the truth.@ 
She also told them that it happened and that she reported it to Mother
before the twins were returned home.

J.G.G., who had been a very outgoing, happy
toddler who loved water and taking baths, was withdrawn and quiet and Areally
just fell apart and did not want to get in the bathtub@ when
Stephanie tried to give him a bath after the second removal.  After a few days, though, he started singing
again.

Stephanie testified that the children had been
with her and her husband a total of eighteen months, that she and her husband
love the children, that the children appear to love her and her husband and
tell them so everyday, and that they=re all
very close.  They have bonded and have a
very strong relationship.  But she also
admitted that E.M.B. has told her before that she wants to go back to Mother.








Stephanie also testified that the children know
the foster parents= extended family and
friends.  She stated that she and her
husband would like to adopt the children if they become available and that she
would be committed to keeping the children in contact with the twins, who are
with other foster parents, including having overnight visits.  She also testified that the children had
visited with the twins three times since the second removal.

Stephanie stated that the children love Mother,
that she believed that Mother showed them love and affection, that she would be
willing for the children to have a relationship with Mother if possible, and
that she had helped the older two children write letters to Mother expressing
that they loved and missed her.

Greta testified that she is the foster mother of
the twins, that the first thing she noticed when they arrived on February 2,
2008, between 12:00 and 1:00 a.m. was their wheezing, that she later learned
that they had bronchitis as a result of having RSV in January, and that even
though they were seven and a half months old when they arrived, C.H. could sit
up for only a short time, M.H. could not sit up at all, and neither baby was
rolling over.  The babies also had solid
food issues.  Greta worked with them on
their milestones and also set up Early Childhood Intervention (ECI)
visits.  At the time of trial, ECI was no
longer needed.  The twins, who slept
sporadically when they first arrived, were sleeping through the night at the
time of trial and eating on a regular schedule.








Greta testified that she and her family are
bonded to the twins, that the twins seem bonded to them, and that if Mother=s rights
were terminated, she and her husband would like to adopt them.

In her first four points, Mother challenges the
legal and factual sufficiency of the endangerment findings under subsections
(D) and (E).  As we have explained in a
similar case, 

Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the
parent-child relationship if it finds by clear and convincing evidence that the
parent has knowingly placed or knowingly allowed the child to remain in
conditions or surroundings that endanger the physical or emotional well-being
of the child.  Under subsection (D), it
is necessary to examine evidence related to the environment of the child to
determine if the environment was the source of endangerment to the child=s physical or emotional
well-being. Conduct of a parent in the home can create an environment that
endangers the physical and emotional well-being of a child.

 

. . . .  Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child=s physical or emotional
well-being was the direct result of the parent=s conduct, including
acts, omissions, and failures to act. 
Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

 








To support a finding of endangerment, the parent=s conduct does not
necessarily have to be directed at the child, and the child is not required to
suffer injury.  The specific danger to
the child=s well-being may be
inferred from parental misconduct alone, and to determine whether termination
is necessary, courts may look to parental conduct both before and after the
child=s birth.  . . . A parent=s decision to engage in
illegal drug use during the pendency of a termination suit, when the parent is
at risk of losing a child, supports a finding that the parent engaged in
conduct that endangered the child=s physical or emotional well-being.  Thus, parental and caregiver illegal drug use
supports the conclusion that the children=s surroundings endanger their physical or
emotional well-being.  A factfinder may
also reasonably infer from a parent=s failure to attend scheduled drug screenings
that the parent was avoiding testing because the parent was using drugs.  As a general rule, conduct that subjects a child
to a life of uncertainty and instability endangers the child=s physical and emotional
well-being.

 

Because the evidence pertaining to subsections 161.001(1)(D) and (E)
is interrelated, we conduct a consolidated review.[6]

 

Applying the appropriate standard of review,[7]
we hold that, based upon our review of the record, the evidence is legally
sufficient to support the trial court=s endangerment
findings regarding Mother under subsections (D) and (E).  Also applying the appropriate standard of
review,[8]
we hold that the evidence is factually sufficient to support those
findings.  We overrule Mother=s first
four points.  We do not reach her fifth
and sixth points.[9]








In her
two final points, Mother contends that the evidence is legally and factually
insufficient to support the best interest finding.  Applying the appropriate standard of review,[10]
we hold that, based upon our review of the record, the evidence is legally
sufficient to support the best interest finding.  We also hold, applying the appropriate
standard of review,[11]
that the evidence is factually sufficient to support the best interest
finding.  We overrule Mother=s
seventh and eighth points.

Having
overruled Mother=s dispositive points, we affirm
the trial court=s final orders terminating her
parental rights.

PER
CURIAM

PANEL:  DAUPHINOT, J.; CAYCE, C.J.; and LIVINGSTON,
J.

DELIVERED:
September 17, 2009











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. ' 161.001(1)(D), (E),
(O) (Vernon 2008).





[3]See id. ' 161.001(2).





[4]See id. ' 161.001(1)(D), (E).





[5]See id. ' 161.001(2).





[6]In re J.W., No. 02-08-00211-CV,
2009 WL 806865, at *4B5 (Tex. App.CFort Worth Mar. 26, 2009,
no pet.) (mem. op.) (citations omitted).





[7]See In re J.P.B., 180
S.W.3d 570, 573B74 (Tex. 2005).





[8]See In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[9]See Tex. R. App. P. 47.1; In
re E.M.N., 221 S.W.3d 815, 821 (Tex. App.CFort Worth 2007, no pet.)
(providing that along with a best interest finding, a finding of only one
ground alleged under section 161.001(1) is sufficient to support a judgment of
termination).





[10]See Tex. Fam. Code Ann. ' 263.307(a), (b)
(Vernon 2008); In re R.R., 209 S.W.3d 112, 116 (Tex. 2006); J.P.B.,
180 S.W.3d at 573B74; Holley v. Adams,
544 S.W.2d 367, 371B72 (Tex. 1976).





[11]See Tex. Fam. Code Ann. ' 263.307(a), (b);
R.R., 209 S.W.3d at 116; H.R.M., 209 S.W.3d at 108; C.H., 89
S.W.3d at 28; Holley, 544 S.W.2d at 371B72.